IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARTY ALLEN DENNIS )<br>)<br>v. )<br>)<br>SOCIAL SECURITY ADMINISTRATION ) | No. 3:14-1537<br>Judge Campbell/Bryant |

To: The Honorable Todd J. Campbell, District Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under Title II of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 16), to which defendant has responded (Docket Entry No. 17). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 9),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

## I. Introduction

Plaintiff filed his application for benefits on June 13, 2010, alleging a disability

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

onset date of January 1, 2010 (Tr. 39)  Plaintiff's claim was denied at the initial and reconsideration stages of state agency review.  Plaintiff subsequently requested *de novo* review of his claim by an Administrative Law Judge (ALJ).  The case came to be heard by the ALJ on December 7, 2012, when plaintiff appeared without counsel and gave testimony.  (Tr. 59-87)  Testimony was also received from an impartial vocational expert.  At the conclusion of the hearing, the ALJ took the matter under advisement until December 18, 2012, when she issued a written decision finding plaintiff not disabled.  (Tr. 39-51)  That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has engaged in substantial gainful activity since January 1, 2010, the alleged onset date, but not over the entire period in question (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments:  ankylosing spondylitis, along with mood and anxiety disorders not otherwise specified (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with lifting and/or carrying 20 pounds on occasion and ten pounds frequently; sitting six hours total in an eight-hour workday; standing and walking four hours total, each, in an eight-hour workday; can occasionally reach overhead; no pushing or pulling; occasional performance of all postural activities; no work around hazards; is limited to unskilled work consisting of simple tasks and instructions; would be better if shown how to do a task rather than told; with occasional contact with the general public; and with occasional changes in the

workplace.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February 15, 1977 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 41, 43, 49-51)

On March 25, 2014, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 4-7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is contained in the ALJ's decision (Tr. 44-47):

The claimant testified that his back pain started about six years before the alleged onset date with the development of lower back pain, leg numbness, and falls. He said it was as if his legs were paralyzed. He indicated that he last worked from March to May of 2010, as already discussed above. He indicated that he received unemployment benefits from 2010-2011. He said he looked for work and continues to look for work, but stated that he has received no offers of employment. Then, the claimant said that he could not work because after 30 minutes on his feet he falls and then could not get up for a time. He claimed that sometimes his wife has to carry him to the bathroom at night because his legs will not work. Note that he said he weighs 200 pounds and is five foot ten inches tall. He said that he could not drive because his legs go numb. He said he could sit for 30 minutes before needing to stand. He said he could stand 15-20 minutes and walk 30-35 minutes, but also said that sometimes he could not walk five minutes. He claims his legs give out. He claimed that sometimes he could not move his neck. He said he could lift a gallon of milk. He admitted that medications help but said that he still does not feel like he used to when he was well. With respect to chores, he said that he helps with the dishes a bit but has to rest during this activity. He said a friend does his yard work. He does no cooking or laundry, but he used to do these chores when he was well. He gave only limited testimony about depression, saying that not being able to help with chores makes him depressed and experience feelings of worthlessness. He indicated that he assists in homeschooling his son, watches television, and reads during the day.

The claimant submitted records from Dr. James Gore, M.D., dating to their first visit on November 21, 2008. The claimant told Dr. Gore that he first started experiencing lower back and leg pain at the age of 17. He reported pain with overuse, relieved somewhat by rest. He obtained minimal benefit from NSAIDs. Dr. Gore's examination showed no weakness or atrophy in any of the claimant's muscles, but there was some loss of spinal motion. Dr. Gore felt the claimant probably had arthritis of his spine. He felt this could possibly be spondyloarthropathy and wanted the claimant checked for inflammatory arthritis. In the interim, Dr. Gore elected to start the claimant on prednisone (Ex. 1F at 5-6). On December 4, 2008, Dr. Gore noted that the claimant did indeed have inflammatory artluitis, with positive HLA-B27 testing and elevated CRP and ESR levels. Dr. Gore noted that a prednisone taper produced significant but not complete improvement in the claimant's arthritis. The claimant's arthritis flared when the taper ended. Dr. Gore elected to resume the prednisone and add methotrexate (Ex. 1F at 4). On January 13, 2009, Dr. Gore noted that the claimant self-discontinued the methotrexate because it caused increased fatigue and dry mouth. The claimant reported severe neck and back pain along with stiffness. He said his back pain improved a little with pain medications. Dr. Gore kept the claimant on prednisone, which had not caused side effects, and added Humira (Ex. 1F at 3).

Meanwhile, the claimant's records from the Center for Spine, Joint, and Neuromuscular Rehabilitation show that he started receiving treatment for his back pain at that facility on December 10, 2008. Staff noted chronic neck, back, and leg pain secondary to ankylosing

4

spondylitis. They noted that the claimant was on Lortab from his primary care provider, until that individual retired, and the claimant's new provider substituted Percocet. Percocet was apparently not controlling the claimant's pain well. The claimant reported constant 8/10 pain. He had poor movement in his spine during examination, but sensation was intact in all his extremities. Staff gave him Lortab, Kadian (morphine), and DMARDs (Ex. 3F at 43-45). On January 9, 2009, the claimant told staff that medications were helping, noting that they "get me through the day, but I still have pain." He complained of sleep difficulty due to pain. He had no medication side effects. He reported he was not missing as many days at work. Staff increased his Kadian dose (Ex. 3F at 40-41). On February 6, 2009, the claimant reported that the increased Kadian was not helping, yet he also reported only 4/10 average pain. Staff increased the frequency of Kadian dosing. They wanted him to try weaning off Lortab. His examination findings were unchanged (Ex. 3F at 38-39). On March 6, 2009, the claimant reported that the increased Kadian frequency was "very helpful." He had not been able to wean off Lortab. He had no medication side effects and only reported 2/10 pain. He reported, "I almost feel like my old self" and that he was "able to keep up with the 27 kids at T-ball." Staff refilled his medications, although they appear to have substituted MS Contin for Kadian (Ex. 3F at 37).

On April 3, 2009, there was no change in his condition; he still had 2/10 pain without side effects from effective treatment. Staff refilled his medications (Ex. 3F at 36). On May 1, 2009, the claimant still reported his medications were working well. He now reported 4/10 average pain, but staff do not appear to have treated this as an increase as they continued his medications and told him to increase his activity as tolerated (Ex. 3F at 35). On May 26, 2009, the claimant reported no increase in pain despite a reported increase in physical activity. Staff refilled his medications. They also restarted Trazodone, which he had apparently been on in the past (Ex. 3F at 33-34). On June 30, 2009, the claimant was still reporting 4/10 pain. He had no side effects and staff refilled his medications (Ex. 3F at 32). On July 28, 2009, the claimant reported that his medications were working well. He noted the Trazodone was helpful. He still had no side effects. He said he was able to keep active by helping with T-ball and running. Despite these activities he still reported 4/10 pain. Staff gave him refills (Ex. 3F at 31). As of August 25, 2009, there had been no change in his condition. He still reported 4/10 pain helped by medication. He still had normal sensory examination. He was running and stretching for exercise. Staff ordered a back brace for additional support and refilled his medications (Ex. 3F at 29-30). On September 22, 2009, the claimant reported 6/10 pain, yet reported his medications were working well to control his pain. He was walking for exercise. He had 5/5 muscle strength and normal sensation in all extremities. He had normal range of motion in his cervical, thoracic, and lumbar spine. He was fitted for a back brace and his medications were refilled (Ex. 3F at 27-28). As of October 20, 2009, there had been no change and his medications were refilled (Ex. 3F at 25-26). On November 17, 2009, the only change was that the back brace was providing relief when he wore it, which was reportedly three times a week (Ex. 3F at 23-24).

The claimant apparently did not return to see Dr. Gore until December 1, 2009. Dr. Gore's note is somewhat confusing, simultaneously reported that the claimant had "little" complaints regarding neck and back pain, along with reports of "severe" back pain. Still, the claimant had less stiffness and decreased fatigue, so it appears his symptoms probably were improved. He was

5

tolerating Humira well. He was also on Lortab from a pain clinic for breakthrough pain (Ex. 1F at 1-2). On December 15, 2009, staff noted no changes except that the claimant had increased his use of the back brace to 3-4 times a week, and that he showed moderate reduction in lumbar spine range of motion on examination (Ex. 3F at 21-22). There was no change on January 12, 2010. His medications were continued, as they "allowed [him] to have a functional life"(Ex. 3F at 19-20). On February 9, 2010, the claimant reported 8/10 worst pain but 6/10 average pain. His medications were refilled (Ex. 3F at 17-18). On March 9, 2010, he reported a reduction in worst pain so that his reported worst and average pain levels were both 6/10. He admitted he was going to the gym and wearing the back brace several times a week. He had only mildly reduced lumbar range of motion and his sensation remained normal (Ex. 3F at 15-16). On April 6, 2010, the claimant reported an increase in pain with 10/10 worst and 8/10 average pain, particularly in his neck. His leg was actually somewhat better, according to his report. Interestingly, his urinary drug screening appears to have come back negative, suggesting he may have had this increase in pain because he was out of or not taking his medication. He did have marked reduction in cervical spine range of motion, but still only mild reduction in his lumbar spine. Staff ordered a magnetic resonance imaging. It came back normal (Ex. 3F at 9-11). On April 30, 2010, the claimant reported reduced pain to 4/10 worst and 4/10 average. He was moderately tender to palpation in his cervical and lumbar spine. There was moderate lumbar motion loss but no stated motion loss in his cervical spine (Ex. 3F at 7-8). On May 27, 2010, the claimant reported his pain was better. He was mildly tender to palpation and now had moderate motion loss in his cervical spine and marked motion loss in his lumbar spine, but retained normal sensation. Staff continued his medications (Ex. 3F at 7-8). On June 29, 2010, staff noted no change except for his range of motion was now only mildly limited in both his cervical and lumbar spine (Ex. 3F at 3-4). There was no change as of July 23, 2010 (Ex. 3F at 1-2). There is then a massive, two-year gap in treatment records pertaining to his back.

Meanwhile, note that the claimant submitted brief records from Family Therapy Centers. These records show that the claimant initially presented on May 14, 2010. He complained of poor sleep, panic symptoms, and depression. He claimed to have daily panic attacks. He denied suicidal ideation, homicidal ideation, or psychosis. He was experiencing some marital conflict at the time. Staff started him on Seroquel XR. This apparently caused too much sedation, so he was switched to regular Seroquel. He initially felt this helped, but then he started having problems sleeping again, and his wife noted increased irritability and anxiety. Staff noted that he had failed multiple medication trials and that his biggest complaints were related to sleep and anxiety. He minimized his depressive symptoms. Staff discontinued Seroquel on June 10, 2010, and told him to take Zyprexa instead (Ex. 2F). The claimant also submitted very brief records from Dr. Edward Leichner, M.D., showing that he saw Dr. Leichner for the first time on June 28, 2010. The claimant complained of stress and anxiety. He noted that his wife also experienced anxiety and that his son was experiencing health problems that included epilepsy. The claimant said that he had panic attacks quite often and that he was seen in a hospital two years earlier. He appears to have claimed panic attacks occupied 15-20 hours a week. He reported "bad" reactions to several SSRI medications. He was going to a therapist (presumably a reference to his recent treatment at Family Therapy Centers) in Columbia, Tennessee. Dr. Leichman started the claimant on Zoloft and Xanax (Ex. 4F at 2-9). On July 23, 2010, Dr. Leichman noted the claimant was doing well on

these medications (Ex. 4F at 1). The claimant submitted no further records from Family Therapy Centers or Dr. Leichman, implying that this was the end of their treatment contact.

The claimant then had some brief contact with Centerstone Community Mental Health Care Centers, Inc. ("Centerstone"), starting on January 27, 2011. The claimant complained of depression, anxiety, and sleep problems. He reported only partial or minimal help from alprazolam (Xanax), which conflicts with what Dr. Leichman suggested at their last visit. He reported no family or personal history of suicide attempts. His seven-year-old son was ill with epilepsy and Ehler-Danlos syndrome. The claimant's mood was anxious on examination but his judgment was intact and he denied suicidal ideation. Staff diagnosed him with mood and anxiety disorders not otherwise specified (Ex. 14F at 13-15). On February 18, 2011, the claimant cancelled an appointment (Ex. 14F at 5). He appeared on February 25, 2011. He reported that diazepam was helping him sleep but was not effective for his anxiety. He also felt buspirone was not effective. The claimant reported that his son had been at Vanderbilt University Medical Center repeatedly. It is not clear if this, or his finances, resulted in his request for a long treatment interval of two months (Ex. 14F at 3). He returned on April 22, 2011, saying he was now satisfied with alprazolam. He wanted a six-month treatment interval now (Ex. 14F at 1). He cancelled his next scheduled appointment on October 7, 2011, and no further treatment visits are documented (Ex. 14F at 6).

Meanwhile, the claimant underwent physical examination by Dr. Bruce Davis, M.D., on March 4, 2011, at the request of the State agency. The claimant showed some loss of motion in his spine and some (significant but not substantial) loss of muscle strength in his leg, without any atrophy. He walked with a slow gait and squatted incompletely. He had good grip. Straight leg raise testing was not positive. Dr. Davis ordered X-ray imaging that showed mild facet osteoarthritis in the claimant's lumbar spine, but no evidence of ankylosing spondylitis. However, Dr. Davis did believe the claimant has this condition. He felt the claimant could lift 20 pounds occasionally and ten pounds frequently; carry 20 pounds occasionally, among other limitations (Ex. 9F).

The only record of any treatment in 2012 shows that the claimant was apparently still on pain and other medications as of September 25, 2012. These included Endocet, Mobic, Sonata, diazepam, and resteril. There is no associated treatment note (Ex. 17F).

Plaintiff retained counsel after the ALJ's decision was rendered, and the following is a summary of evidence presented before the Appeals Council:

**ProHealth Rural Health Services** On June 15, 2011 a lumbrosacral x-ray report revealed osteoarthritis in Mr. Dennis' sacroiliac joints bilaterally. (R. 352). Presumably the radiological studies were ordered by Dr. Le as the report was forwarded to his office. *Id.* Mr. Dennis' first office visit to ProHealth occurred on September 12, 2011. (R. 354). The purpose for his visit was to obtain a referral to a pain clinic. *Id.* He was noted for lower back pain and stiffness and diagnosed with chronic pain and ankylosing spondylitis. *Id.*

7

He returned to ProHealth on October 18, 2011 for prescription refills and was noted to have been dismissed from the pain clinic on September 5, 2011. (R. 351). Mr. Dennis was again diagnosed with chronic pain syndrome and anxiety and was advised to seek pain management or rehab. *Id.* On June 5, 2012 Mr. Dennis presented to ProHealth in moderate distress secondary to pain. (R. 350). He is noted to have a complete loss of lordosis in the lower back, tenderness over the *cervical, thoracic and lumbar spine and exquisite tenderness over the bilateral sacroiliac joints.* His fingers were noted to have slight ulnar deviations deformities bilaterally. Id. Mr. Dennis was also noticed to be suffering from a skin sensation disturbance. Id. The plan of care then, was for refills of Lortab and referrals to pain management and rheumatology. Id. Mr. Dennis returned July 5, 2012 for follow up and for status of his pain management referral. (R. 348). The ProHealth records indicate that Mr. Dennis was dismissed from pain management in the Fall of 2011 because a urine drug screen came back positive for cocaine. The chart noted that Mr. Dennis appeared as if he was going through withdrawal symptoms at his last visit (June 5, 2012) and it was noted that Mr. Dennis had not been prescribed medicine since the Fall of 2011. Id. He had continued symptoms of severe pain, loss of lordosis in the lumbar spine and tenderness over the entire spinal structure. Id. A urine drug screen was collected an[d] came back negative for illicit drugs and positive for the prescribed medications. (R. 346). His prior cocaine abuse was determined to be in remission. (R. 348).

An August 7, 2012 office visit revealed continuing symptoms along with significant sleep interference from pain. (R. 344). His pain medications were refilled and a sleep study was ordered. A urine drug screen came back negative for illicit drugs and positive for his prescribed medications. Mr. Dennis was referred to pain medicine and rehabilitation for pain management. *Id.*

Mr. Dennis presented for a pain management evaluation to Dr. John C. Nwolfa, M.D. of pain management and rehabilitation on August 14, 2012. (R. 359-362). By history Mr. Dennis offered that he had been taking pain medications for about 10 years. (R. 359). He described aching lower back pain with occasional radiation into the anterior thighs to the knees, right greater [than] left. Id. He stated that pain increased with walking and rising from the seating position. Id. Physical examination revealed limited range of motion of the lumbar spine on all planes. (R. 361). Dr. Nwolfa noted that radiological studies were significant for arthritic changes in the bilateral sacroiliac joints. Id. Dr. Nwolfa's plan included discontinuing Lortab and prescribing Endocet, Mobic and Restoril. *Id.*

A return visit to pain management confirmed no resolution in his pain symptoms and Mr. Dennis was prescribed Morphine again along with Endocet and Mobic. (R. 357). Mr. Dennis returned to ProHealth after assimilation with pain management, reporting some help, but that he is always tired and felt poorly. (R. 339). His musculoskeletal pain was reported as extreme with moderate to severe limitations in movement. *Id.*

Rhonda Kopra, P.A-C, MSN from Prohealth completed two assessments regarding Mr. Dennis on January 31, 2013 at the request of his attorney at the Appeals Council level, John P. Garner Esquire. (R. 363-366). The first is an assessment under Listing 14.00C wherein Ms. Kopra indicated that Mr. Dennis met the listing for ankylosing spondylitis. (R. 363-364). The second form is a Medical Assessment Of Ability To Do Work Related Activities. (R. 365-366). The

8

Medical Assessment provided that Mr. Dennis can occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk less than 2 hours in an 8 hour work day, required an assisted device for safe ambulation on a job site, sit less than 2 hours in an 8 hour work day and never stoop or crouch. (R. 365). Ms. Kopra further indicated that Mr. Dennis' pain level and/or medication side effects were likely to interfere with sustained concentration, persistency and pace up to 2/3 of the time in 8 hour day and that Mr. Dennis would need a job which affords unscheduled breaks for pain control. (R. 366).

(Docket Entry No. 15 at 4-7)

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

## B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in reaching a determination of plaintiff's RFC that was not supported by substantial medical evidence, and in failing to exercise her

11

heightened duty to fully and fairly develop the record. As further explained below, the undersigned finds that the ALJ did not adequately develop the testimonial record at the hearing on the then-unrepresented plaintiff's claim, and that remand is therefore in order.

Plaintiff "takes issue with the fact that the ALJ never developed any evidence in the record, post-hearing." (Docket Entry No. 15 at 19) However, the undersigned does not find that the ALJ had any special duty to develop the documentary record in this case. It is the claimant's burden to prove by sufficient evidence his disability, a burden that is only mitigated by his lack of representation when he is also incapable of presenting an effective case and unfamiliar with hearing procedures. See Wilson v. Comm'r of Soc. Sec., 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008) (citing Lashley v. Sec'y of Health & Human Servs., 708 F.2d 1048 (6th Cir. 1983)). Unlike the unrepresented claimant in Lashley (a 79 year-old with a fifth grade education, who after suffering two strokes had trouble reading, writing, and reasoning), and notwithstanding plaintiff's argument on this front, the hearing transcript reveals that plaintiff had a good enough grasp of the nature of the proceedings to present his case for disability.

Rather, at issue here is the basic duty of an ALJ to ensure the full and fair hearing of any disability claim, Lashley, 708 F.2d at 1051 (citing Richardson v. Perales, 402 U.S. 389 (1971)), albeit under the careful scrutiny of the hearing record which courts in this circuit apply when the claimant is unrepresented. Id. at 1052 (citing Holden v. Califano, 641 F.2d 405, 408 (6th Cir. 1981)). At plaintiff's hearing, the ALJ scrupulously explored with plaintiff his right to be represented before the ALJ, ensuring that plaintiff knew and understood that right as well as the agency's parameters for ensuring that he

would not be overcharged by any representative whose services he might engage. (Tr. 59-61) Accordingly, plaintiff knowingly waived his statutory right to representation. In such circumstances the ALJ is clearly not charged with questioning the claimant as a lawyer would do, inasmuch as she is not plaintiff's advocate but an impartial examiner charged with developing the facts in evidence. Perales, 402 U.S. at 410. Nonetheless, the hearing transcript and subsequent decision of the ALJ reveals that the facts in evidence -- and, more saliently here, those not in evidence -- were not properly developed.

Immediately after swearing plaintiff in, the ALJ asked if he had had the opportunity to review the evidence in his file (to which plaintiff responded in the affirmative) and if he had any objection to any of that evidence (to which plaintiff responded in the negative). (Tr. 64) The ALJ then recognized that plaintiff had brought in three additional evidentiary exhibits, which were then made part of the record. (Tr. 64-65) The ALJ proceeded to examine plaintiff extensively about his past work and his efforts to obtain work during his insured period. (Tr. 67-70) She questioned him briefly about his family situation, and whether plaintiff is the one who routinely drives his disabled son to the hospital. (Tr. 71-72) The ALJ then turned to the subject of plaintiff's functional limitations, and the following colloquy ensued:

Q Okay. We sent you a function report and you filled it out [on July 25, 2010][2] and at that time, you wrote that you cared for your wife and your son, you had no problems taking care of yourself meaning bathing, dressing, showering, you could

---

[2] This function report is contained at pages 160-167 of the transcript of the administrative record.

prepare simple meals, you were able to drive and shop. Has anything happened to change that?

A     Yes. . . .

Q     . . . Are you -- so are you currently getting medical care right now on a regular basis?

A     Yes.

Q     Who do you see?

A     I see Dr. Coper [PHONETIC][3] for my primary care doctor and I just started a new pain clinic when my insurance changed. It's -- I've only been two months, the Spine [INAUDIBLE] I want to say in Brentwood.

Q     Okay.

A     I -- I tried to get paperwork from them, but they're still waiting on Dr. Coper to send my paperwork over to them with my stuff on it. So I'm kind of waiting --

Q     Okay.

A     -- on that.

Q     Okay.

A     So I really haven't got to see her too much yet.

---

[3]The undersigned presumes that the phonetic "Coper" refers to Ms. Kopra, a certified physician's assistant who treated plaintiff beginning in the fall of 2011.

14

(Tr. 73-74) After questioning plaintiff further about his functional abilities and his prescribed medications, the ALJ asked if the medications "were just prescribed recently by the pain clinic?" (Tr. 76) Plaintiff responded that his narcotic pain medication was prescribed by the new pain clinic, but that his other medications were prescribed by Centerstone. Id. He then testified that he stopped going to Centerstone, his rheumatologist, his old pain clinic, and his old primary care doctor in the fall of 2011 due to a change in insurance, and that his new primary care doctor provided treatment until he could get into another pain clinic that would take his insurance. (Tr. 76-77) The ALJ then questioned plaintiff a bit further about his functional abilities before concluding his examination of plaintiff and turning to the vocational expert. (Tr. 77-80) Finally, just before adjourning the hearing, the ALJ initiated the following colloquy:

Q     So that means I'm getting close to ending your hearing. Before I do that, is there anything that you would like to bring up or tell me that we have not already discussed?

A     About?

Q     Anything that you want me to know in regards to your request for disability.

A     Like med -- medical conditions that they've added on recently or --

Q     Sure.

A     -- that --

Q     Well, anything that you think I haven't dis -- talked about.

A     Oh, another thing that I have is a bulging disc in my neck and that should be in the

> Q Okay.
>
> A So sometimes my neck's stiff and I can't move it.
>
> Q Have you had an MRI of your neck?
>
> A Yes, and it shows that the C5 and C disc are narrowing and they're going to fuse together eventually like my lower back from the ankylosing spondylitis.
>
> Q Okay. All right. . . .

(Tr. 85-86)

Eleven days after the hearing, the ALJ issued her decision denying plaintiff's claim. In summarizing the record of plaintiff's medical treatment, the ALJ referred to the treatment notes from Dr. Gore through January 2009, and to the notes from the Center for Spine, Joint, and Neuromuscular Rehabilitation through July 23, 2010 (Tr. 44-46), following which the ALJ stated "[t]here is then a massive, two-year gap in treatment records pertaining to his back." (Tr. 46) After reviewing the records of plaintiff's mental health treatment, the ALJ noted that "[t]he only record of any treatment in 2012 shows that the claimant was apparently still on pain and other medications as of September 25, 2012." (Tr. 47) Finally, in assessing the credibility of plaintiff's subjective complaints, the ALJ stated as follows:

> The undersigned must note that there is a large gap in the claimant's treatment records. It is not clear what, if any, treatment aside from medication the claimant received during this period. The presumption is

paperwork and things like that.

> that he received no treatment, and thus required no treatment. No evidence suggesting he sought out but could no longer afford treatment was provided, nor was any evidence submitted showing that he sought or was denied free or reduced cost health care.

(Tr. 48)

It is apparent from the portions of the hearing transcript reviewed above that the ALJ had reviewed the record and was aware of the lack of evidence of plaintiff's physical treatment after July 2010, when plaintiff submitted his function report. It was revealed at the hearing that plaintiff had switched primary care doctors, among others, in the fall of 2011 due to a change in his insurance. Plaintiff further testified that he was currently seeing Ms. Kopra, and that he had an outstanding request for medical records from his new pain clinic which was awaiting Ms. Kopra's transmission of treatment records. Despite these indications that plaintiff had in fact received treatment in 2011 and early 2012, and the ALJ's awareness of the "massive" gap in the documentary record of plaintiff's medical treatment, the ALJ did not inquire directly of plaintiff as to why there was no evidence from this timeframe in the record, and did not offer to hold the record open to receive the outstanding records from plaintiff's new pain clinic. Given his testimony that evidence of his cervical disc bulge "should be in the paperwork," and his reference to Ms. Kopra as a name that the ALJ should recognize, it appears that plaintiff may have been under the impression that those records had been submitted, when in fact they had not. As recited in the review of the record above, supra at 7-9, and as evidenced by newly retained counsel for the plaintiff in proceedings before the Appeals Council, plaintiff was indeed treating with Rhonda Kopra, P.A-C, MSN, of ProHealth Rural Health

17

Services during 2011 and 2012.

Similar scenarios have resulted in findings that the duty to ensure a full and fair hearing was not fulfilled. In Bevelle v. Comm'r of Soc. Sec., 2008 WL 5351020 (E.D. Mich. Dec. 18, 2008), the court remanded after finding, *inter alia*, as follows:

> "[W]here the claimant is unrepresented by counsel, the ALJ has a duty to exercise a heightened level of care and assume a more active role' in the proceedings." [Quoting Lashley]. Although the ALJ clearly advised Plaintiff of her right to counsel at the hearing, the ALJ failed to develop the record at the hearing with respect to what the ALJ found was a lack of treatment for nearly a year and a half prior to Plaintiff's knee replacement surgery. The ALJ did not inquire at the hearing regarding the "gap" in medical treatment, despite Plaintiff's testimony that she was "still seeing" Dr. Haggins for the rheumatoid arthritis in her hands, elbow and ankle. An inquiry by the ALJ regarding the gap in treatment records may have revealed ongoing treatment during this time and the need to obtain the medical records.

Id. at *9. Furthermore, in Gonzalez v. Comm'r of Soc. Sec., 2011 WL 2313009 (E.D. Mich. May 19, 2011), the court declined to analyze whether the ALJ had a "special, heightened duty" to develop the documentary record, but noted that any argument that the claimant should have raised the issue of his missing treatment records during the hearing would appear to weigh in favor of finding such a duty. Id. at *5 n.2. The Gonzalez court resolved the matter as follows:

> In this matter, the ALJ had notice at several points in the hearing and in the record that there was a treatment history for which he did not have records and there was no follow-up on this issue. During the hearing, Plaintiff indicated a belief that some of these records, specifically the current prescription information, was in his file.
>
> The Court does not make a finding that the ALJ had an affirmative duty to

> acquire medical records that were not a part of the Administrative Record. The Court's recommendation herein neither imposes additional duties on the ALJ beyond developing the record at the administrative hearing nor shifts the burden of proof from Plaintiff at steps one through four of the sequential analysis. . . . In these circumstances the issue of two years of treatment records so obviously not available in the file should have been developed through inquiry at the hearing. For all of these reasons, the ALJ's denial was not based on substantial evidence.

Id. at *5.

In line with these district court decisions, and considering the record before this Court, the undersigned finds that the ALJ did not fulfill her duty to fully and fairly develop the facts in evidence at plaintiff's hearing. Accordingly, the undersigned concludes that reversal of the SSA's decision and remand for further factfinding, rehearing, and a new decision is in order.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific

objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 16th day of September, 2015.

       s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE